Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/08/2017 08:11 AM CDT

STATE OF NEBRASKA, APPELLEE, v. HENRY O.
SALVADOR RODRIGUEZ, APPELLANT.

___ N.W.2d ___

Filed June 16, 2017.    No. S-16-563.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Warrantless Searches: Appeal and Error.** In reviewing a trial court's denial of a motion to suppress evidence obtained by a warrantless search under the emergency doctrine, an appellate court employs a two-part standard in which the first part of the analysis involves a review of the historical facts for clear error and a review de novo of the trial court's ultimate conclusion that exigent circumstances were present. Where the facts are largely undisputed, the ultimate question is an issue of law.

3. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), and the trial court's decision will not be reversed absent an abuse of discretion.

4. **Search and Seizure: Warrantless Searches: Proof.** Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications. The State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement.

5. **Search and Seizure: Warrants: Police Officers and Sheriffs.** In the case of entry into a home, a police officer who has obtained neither an

arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry in the absence of exigent circumstances.

6. **Search and Seizure: Words and Phrases.** The "emergency doctrine" is a category of exigent circumstances. The elements of the emergency doctrine are that (1) the police must have reasonable grounds to believe there is an immediate need for their assistance for the protection of life or property and (2) there must be some reasonable basis to associate the emergency with the area or place to be searched.

7. **Constitutional Law: Police Officers and Sheriffs.** An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances viewed, objectively, justify the action.

8. **Police Officers and Sheriffs: Probable Cause.** The presence of an emergency, like probable cause, hinges on the reasonable belief of the officers in light of specific facts and the inferences derived therefrom, not whether, in hindsight, one actually existed.

9. **Search and Seizure: Police Officers and Sheriffs: Probable Cause.** The first element of the emergency doctrine is similar to probable cause and asks whether the facts available to the officer at the moment of entry warranted a person of reasonable caution to believe that entry was appropriate.

10. **Search and Seizure: Police Officers and Sheriffs: Burglary.** Courts generally find sufficient exigent circumstances to justify the warrantless entry into a home when a police officer reasonably believes that a burglary is in progress or was recently committed therein.

11. **Burglary.** A burglary indicates an immediate need to secure the premises because it raises the possibility of danger to an occupant and the continued presence of an intruder.

12. **Other Acts: Words and Phrases.** Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), concerns evidence of other crimes, wrongs, or acts. Other acts under rule 404(2) are acts that are not part of the events giving rise to the present charges.

13. **Indictments and Informations: Words and Phrases.** The phrase "on or about" in an information indicates the date with approximate certainty.

14. **Criminal Law: Time: Words and Phrases.** The crime of "possession" may extend over a period of time if uninterrupted.

15. **Criminal Law: Statutes: Words and Phrases.** Absent language indicating differently, "possession" within a criminal statute contemplates a continuing offense as opposed to a single incident.

16. **Criminal Law: Time: Words and Phrases.** An offense is continuing if set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy; an offense which continues day by

day; a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences.

17. **Evidence: Other Acts: Words and Phrases.** Evidence of uncharged criminal activity is not considered "other crimes" evidence under Neb. Evid. R. 404(1)(b), Neb. Rev. Stat. § 27-404(1)(b) (Reissue 2016), if it arose out of the same transaction or series of transactions.

18. **Records: Appeal and Error.** Where allegedly prejudicial remarks of counsel do not appear in the bill of exceptions, an appellate court is precluded from considering an assigned error concerning such remarks.

19. **Motions for New Trial: Affidavits: Evidence: Records: Appeal and Error.** Affidavits in support of a motion for new trial must be offered in evidence and preserved in and made a part of a bill of exceptions to be considered by an appellate court.

20. **Motions for New Trial: Testimony: Affidavits: Records: Appeal and Error.** An appellate court will not review testimony in the form of affidavits used in the trial court on the hearing of a motion for new trial, unless such affidavits have been included in and presented by a bill of exceptions.

Appeal from the District Court for Sheridan County: Travis P. O'Gorman, Judge. Affirmed.

Travis Penn, of Penn Law Firm, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## I. NATURE OF CASE

The defendant appeals from his conviction of possession of methamphetamine with intent to deliver. At issue is whether the trial court should have suppressed evidence found during a search with a warrant that was obtained as a result of observing defaced firearms during a prior warrantless search for a possible burglar at the request of a houseguest. Also at issue is whether the defendant was prejudiced by the admission,

without a limiting instruction, of evidence of his drug use around the time specified in the information. The defendant argued the drug use was evidence of prior bad acts subject to Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016). The court concluded the drug use was intrinsic to the crime charged. Finally, the defendant argues he was prejudiced by comments purportedly made by the prosecutor during closing arguments erroneously stating that the defendant owned the home he lived in.

## II. BACKGROUND

Henry O. Salvador Rodriguez was charged with one count of possession of methamphetamine with intent to deliver and one count of possession of a defaced firearm, both on or about July 30, 2014. A jury found Salvador Rodriguez guilty of possessing methamphetamine, in an amount of over 10 grams, with intent to deliver. The jury found Salvador Rodriguez not guilty of possession of a defaced firearm.

### 1. Warrantless Search

Salvador Rodriguez sought suppression of all evidence obtained during searches of his place of residence conducted pursuant to warrants that were issued based on observations during an initial warrantless search. The State asserted that the warrantless search was reasonable because of the exigent circumstance of a possible intruder in the house. Alternatively, the State argued the search was authorized by Lori Ezell, who had common authority over the house.

### (a) Officer Testimony

Officer Adam Wackler testified that on July 23, 2014, he responded to a report of a domestic disturbance between Ezell and Gilbert Chavez at the apartment where Chavez lived. Wackler had responded previously to similar disturbances at that apartment. Wackler suggested that Ezell and Chavez spend the night apart, and they agreed.

Ezell told Wackler that she had the key to a friend's house because she was taking care of the friend's dog and that she stayed there when she was not getting along with Chavez. Ezell told Wackler that she had a bedroom at that house and that she kept some of her and her children's things there. Ezell said she stayed at the house sometimes for just a day, other times for 2 weeks; it depended on the situation.

Ezell explained to Wackler that her friends, whom she identified as Salvador Rodriguez and Rosa Anguiano, were out of town. She explained that Salvador Rodriguez and Anguiano rented the house, hereinafter referred to as the "Salvador Rodriguez house."

Wackler testified that after making a telephone call, Ezell reported to him that Salvador Rodriguez and Anguiano had given Ezell permission to stay at their house that night. Wackler drove Ezell and one of her children to the Salvador Rodriguez house.

A couple of hours later, Wackler received another call from Ezell. Wackler had given Ezell his work cell phone number to use in case things escalated further between Ezell and Chavez that night. Ezell seemed upset. She told Wackler that she was afraid an intruder was in the Salvador Rodriguez house. Wackler met Ezell and her child on a street corner near the house.

Ezell told Wackler that she had gone for a walk with her child. When she returned to the Salvador Rodriguez house, all the lights were on and she thought she saw somebody in the garage looking at her. Ezell reported that she had shut and locked the door and had turned off all the lights in the house before leaving for their walk.

Ezell told Wackler that she was afraid to go back into the house, because she knew Salvador Rodriguez and Anguiano were not there. She asked Wackler to come and make sure that nobody was inside.

When Officer Clay Heath arrived as backup, Wackler and Heath approached the Salvador Rodriguez house and observed

that the front door was unlocked and open a crack—though in later testimony Wackler described that it was closed but was not latched closed.

Wackler and Heath entered and proceeded to clear the house by looking "anywhere that a person could fit." They did not find anyone in the house. When looking in closets, however, Wackler and Heath observed two firearms in plain view. In the closet of the kitchen, they observed a shotgun that appeared to have the barrel cut off. In the closet of the master bedroom, they saw a pistol.

Concerned that someone might be hiding in the house who would have access to the weapons, Wackler and Heath made sure that the pistol did not have ammunition. They picked it up to clear the chamber. In doing so, they found that the pistol's serial number appeared to have been partially scratched off. They returned the pistol and continued their search. It was unclear whether Wackler and Heath picked up the shotgun in the kitchen.

After ensuring that no one was in the Salvador Rodriguez house, Wackler and Heath returned the keys to Ezell. Anguiano called Wackler later that night to ask if the house had been broken into. Wackler reported that because Ezell did not see anything out of place, he did not think so. Wackler confirmed with Anguiano that Ezell had permission to stay in the house.

### (b) Ezell's Testimony

Ezell testified that she stayed at the Salvador Rodriguez house at least once a week, when she and Chavez would "get into it." She had a bedroom there where she and her children slept when they stayed the night. She kept some of her and her children's possessions in that bedroom and had a key to the house.

Ezell repeatedly testified that she moved into the Salvador Rodriguez house approximately 1 week prior to July 23, 2014. But in other testimony, she seemed to indicate that she moved into the Salvador Rodriguez house on July 23.

After moving in, Ezell considered herself a "permanent resident" insofar as she was living there and had all of her and her children's belongings there. She described those belongings as clothing, toiletries, medicines, and a crib. Salvador Rodriguez and Anguiano told her to "make it like it was [her] own home." She further affirmed that she had "free rein over the entire house." Ezell said she was a "guest" inasmuch as she did not pay any bills or rent.

Ezell testified that a couple of hours after Wackler responded to the domestic disturbance report, she called Wackler because she thought an intruder was inside the Salvador Rodriguez house. Salvador Rodriguez and Anguiano were out of town all that week. Ezell and her children had gone to get ice cream. When they returned, she noticed that a light was on and the garage door was open, but she did not think anything of it right away. One of her children wanted to go back to get more ice cream, and when they exited the house, they saw Ezell's van with all the doors open, including the back hatch. She had left all the van doors closed. One of her children screamed that someone was in the garage. Ezell testified that she also saw someone in the garage.

Sometime after Wackler and Heath searched the house and found no intruders, Ezell called Salvador Rodriguez and Anguiano. Ezell testified that neither gave her any indication that she did not have authority to ask the police to check if there was an intruder in the house. Salvador Rodriguez reportedly told her, "'It's okay. I had someone go check on the house.'"

### (c) Subsequent Searches

On July 30, 2014, Wackler and Heath obtained a warrant to search the Salvador Rodriguez house, based on their observations of the defaced firearms. A water bill confirmed Salvador Rodriguez and Anguiano as the residents, either the owners or the renters, of the house. At trial, Wackler testified that photographs inside the home, as well as other documents, such as

checkbooks and tax documents, identified Salvador Rodriguez and Anguiano as the residents of the house.

When conducting the search pursuant to the warrant, Wackler and Heath found what appeared to be methamphetamine under a couch in the basement. On August 2, 2014, Wackler and Heath obtained another warrant, to search for drugs and drug paraphernalia. In the search conducted pursuant to this second warrant, they found more methamphetamine under the couch in the basement, as well as underneath a basement sink.

### (d) Trial Court's Order

The court overruled the motion to suppress. The court found that Wackler was called to a domestic dispute between Ezell and Chavez and that Ezell had Wackler take her to the Salvador Rodriguez house. The court found that Ezell advised Wackler that she was housesitting for Salvador Rodriguez and Anguiano, had a key to the premises, stayed there off and on when she and Chavez were fighting, and had a room at the house.

The court found that after a couple of hours, Ezell called Wackler and reported that upon her return from a walk, the lights of the residence were on and she thought she saw someone in the garage. Ezell told Wackler that she had shut off all the lights and locked the door before going for her walk. Ezell was frantic, very upset, and scared. She asked Wackler to check the house to make sure no one was inside.

The court found that once Heath arrived as backup, the officers approached the house and noticed the lights were on and that the door was unlocked and not entirely shut. They entered the house and searched the house only in locations where it was reasonable that a person could hide.

In the closet of the master bedroom, the officers saw a revolver. The court found that for their safety, Wackler and Heath decided to clear the handgun of any ammunition. In doing so, they noticed that the serial number had been altered

or filed and that it was defaced. After clearing the bedroom, the officers searched a closet in the kitchen that was large enough for a person to hide in. Inside, they found a shotgun that appeared to have been altered.

The trial court concluded that the warrantless search at issue was reasonable under the Fourth Amendment either as a search undertaken with consent or as a search conducted under exigent circumstances. With regard to its conclusion that the search was undertaken with consent, the court reasoned that Wackler had a reasonable basis to conclude that Ezell had common authority over the house at that time. With regard to the exigent circumstances, the court reasoned that Wackler had reasonable grounds to believe that there was an emergency and that the clearing of the guns found during the search did not exceed the scope of the exigency.

### (e) Evidence Seized During Searches

The motion to suppress was overruled. The evidence adduced at trial showed that a total of approximately 340 grams of methamphetamine was seized during a search of the Salvador Rodriguez house. From the master bedroom, the officers also seized the pistol and drug paraphernalia; they did not find the sawed-off shotgun.

### 2. Prior Drug Use

The prosecution offered testimony by Ezell describing Salvador Rodriguez' drug usage and how he kept methamphetamine under the basement couch and provided the drug to her and other guests. No notice was filed by the State prior to trial advising Salvador Rodriguez that it intended to adduce any evidence of prior bad acts under rule 404(2), and Salvador Rodriguez did not file any pretrial motions concerning the possible admission of prior bad acts. No hearing pursuant to rule 404(3) was conducted outside the presence of the jury to determine whether the State proved by clear and convincing evidence that a prior crime, wrong, or act occurred.

Ezell testified, without objection, that she and Salvador Rodriguez used methamphetamine together in the basement of the Salvador Rodriguez house as follows:

Q[.] Once you became friends with [Anguiano] did you also get to know [Salvador Rodriguez] better as well?

A[.] Yes.

Q[.] In what way?

A[.] We both shared a habit that we used together.

Q[.] Well, let's talk about that. You said you shared a habit that you used together. What do you mean by that?

A[.] We both used meth.

. . . .

Q[.] And when you began using methamphetamine, how did it happen that you started using it?

A[.] The owners of the plant first offered it to me at a party. And that's when I very first started using it.

Q[.] And you said that you and [Salvador Rodriguez] shared in that habit. What did you mean by that?

A[.] After I got to know him a little better, I found out that he also smoked meth and so we would smoke meth together.

Q[.] And where would you typically do that?

A[.] At his house.

Q[.] Where at in the house?

A[.] In the basement.

When the prosecutor proceeded after this questioning to ask if other people smoked methamphetamine with Ezell and Salvador Rodriguez, defense counsel objected for the first time. Defense counsel objected on the ground that the line of questioning violated rule 404. The court sustained the objection, but denied defense counsel's motion to strike Ezell's testimony that she and Salvador Rodriguez smoked methamphetamine together.

When the prosecutor pursued further questioning about Ezell's and Salvador Rodriguez' drug usage, the attorneys

approached the bench for an off-the-record discussion. Questioning about drug usage after that was focused on the summer of 2014. Defense counsel made a continuing objection to "any evidence regarding past use of drugs" as being in violation of [rule 404]. The court overruled the objection.

Ezell then testified that two or three times a week she smoked methamphetamine with Salvador Rodriguez in his basement. Other people were sometimes present. The methamphetamine that anyone used in the basement always came from underneath the basement couch.

Ezell also testified that she once saw Anguiano with a large amount of cash. Ezell testified that on the day of the "raid" on the house, Salvador Rodriguez admitted to her that law enforcement would find large quantities of methamphetamine there, because he was a dealer.

After the State's case in chief, defense counsel called several character witnesses who testified generally as to Salvador Rodriguez' good character and testified that Salvador Rodriguez was not a drug user or abuser.

At the jury instruction conference, defense counsel conceded that he was not arguing that the evidence of Salvador Rodriguez' drug usage with Ezell was inadmissible. Defense counsel asked for a jury instruction that would ensure the jury would use the evidence for its independent relevance and not for propensity reasoning. The trial court denied the request and did not instruct the jury on the proper purpose for which it could consider the evidence of Salvador Rodriguez' drug use. The court reasoned that the drug use was not prior bad acts, but instead was an integral part of and contributed to the factual setting of the crime charged.

### 3. Closing Arguments

No record was made of closing arguments. Neither did Salvador Rodriguez make an offer of proof concerning any statements allegedly made during closing arguments. In a motion for new trial, defense counsel alleged that the prosecutor

stated in closing arguments that Salvador Rodriguez "'owned'" the house where the methamphetamine was found. The motion further alleged that defense counsel's objections to such testimony were overruled. Defense counsel attached to the motion an affidavit averring that the factual allegations in the motion for new trial were true.

The jury was instructed that "possession" of a thing means either knowingly having it on one's person or knowing of its presence and having the right to exercise dominion and control over it. During deliberations, the jury asked, "Is there any other evidence that [Salvador Rodriguez] had leased or rented the house?" and "Does ownership/lease equate to liability?" The court answered that the jury had received all the evidence and must refer to the jury instructions.

## III. ASSIGNMENTS OF ERROR

Salvador Rodriguez assigns that the trial court erred when it (1) overruled his motion to suppress evidence gained as a result of the warrantless search of his residence, (2) allowed evidence of past methamphetamine use, (3) gave no limiting instruction concerning for what limited purpose the evidence of past methamphetamine use was allowed, and (4) overruled his objection during closing arguments to the State's comments that he owned the house where he lived.

## IV. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.[1]

---

[1] *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017).

[2] In reviewing a trial court's denial of a motion to suppress evidence obtained by a warrantless search under the emergency doctrine, an appellate court employs a two-part standard in which the first part of the analysis involves a review of the historical facts for clear error and a review de novo of the trial court's ultimate conclusion that exigent circumstances were present.[2] Where the facts are largely undisputed, the ultimate question is an issue of law.[3]

[3] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 404(2), and the trial court's decision will not be reversed absent an abuse of discretion.[4]

## V. ANALYSIS

Three basic issues are raised in this appeal. First, Salvador Rodriguez asserts that the court should have suppressed the physical evidence found in his home, because it was the fruit of a warrantless search. Second, Salvador Rodriguez argues he was prejudiced by the lack of a limiting instruction concerning what he contends was evidence of prior bad acts within the purview of rule 404. Lastly, Salvador Rodriguez argues there was prosecutorial misconduct during closing arguments when the prosecutor falsely stated Salvador Rodriguez owned the home where he resided.

### 1. MOTION TO SUPPRESS EVIDENCE OBTAINED IN WARRANTLESS SEARCH

[4] Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications.[5] The State has the burden of showing the

---

[2] See *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006).

[3] *State v. Modlin*, 291 Neb. 660, 867 N.W.2d 609 (2015).

[4] *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016).

[5] See, *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017); *State v. Perry*, 292 Neb. 708, 874 N.W.2d 36 (2016).

applicability of one or more of the exceptions to the warrant requirement.[6]

[5] In the case of entry into a home, a police officer who has obtained neither an arrest warrant nor a search warrant cannot make a nonconsensual and warrantless entry in the absence of exigent circumstances.[7] The trial court found that the search of the Salvador Rodriguez house was justified by the exigent circumstance of a possible burglary in progress and by being, regardless, consensual.

The question presented on appeal is whether the trial court was correct in determining that the warrantless search was constitutional because a reasonable officer would have believed either that (1) a burglary was in progress or (2) Ezell had authority to consent to the search. The parties do not dispute that if the warrantless search was unreasonable, the court should have suppressed evidence of the items seized during subsequent searches pursuant to warrants based on the items observed during the warrantless search. The parties do not dispute that if the warrantless search was reasonable, any handling of the weapons in plain view in order to ensure officer safety was within the proper scope of the search.

We conclude that the exigent circumstance of a possible burglary in progress justified the warrantless search, and we need not address the alternative basis from the trial court's order that Ezell had authority to consent to the search.

[6] The "'emergency doctrine'" is a category of exigent circumstances.[8] The elements of the emergency doctrine are that (1) the police must have reasonable grounds to believe there is an immediate need for their assistance for the protection of life or property and (2) there must be some reasonable basis to associate the emergency with the area or place to be searched.[9]

---

[6] *State v. Perry, supra* note 5.

[7] See *State v. Eberly, supra* note 2.

[8] See *id*. at 900, 716 N.W.2d at 677.

[9] See *id*.

The first element considers whether there were reasonable grounds to find an emergency, and the second element considers the reasonableness of the scope of the search.[10] Salvador Rodriguez focuses only on the first element and argues that reasonable police officers would not have had grounds under these facts to believe there was an immediate need for their assistance for the protection of life or property.

[7-9] An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances viewed, objectively, justify the action.[11] The presence of an emergency, like probable cause, hinges on the reasonable belief of the officers in light of specific facts and the inferences derived therefrom, not whether, in hindsight, one actually existed.[12] The first element of the emergency doctrine is similar to probable cause and asks whether the facts available to the officer at the moment of entry warranted a person of reasonable caution to believe that entry was appropriate.[13]

[10,11] Courts generally find sufficient exigent circumstances to justify the warrantless entry into a home when a police officer reasonably believes that a burglary is in progress or was recently committed therein.[14] A burglary indicates an immediate need to secure the premises, because it raises the possibility of danger to an occupant and the continued presence of an intruder.[15]

In *State ex rel. Zander v. District Court*,[16] the court found that an officer reasonably believed a burglary might be in progress in a house after a neighbor reported that he knew

---

[10] See *id.*

[11] See *id.*

[12] See *id.*

[13] See *State v. Eberly, supra* note 2.

[14] See *id*. See, also, Annot., 64 A.L.R.5th 637 (1998) (and cases cited therein).

[15] See *State v. Eberly, supra* note 2.

[16] *State ex rel. Zander v. District Court*, 180 Mont. 548, 591 P.2d 656 (1979).

no one was at home, he saw someone tampering with a window in the home, and the door to the home was always kept locked. The investigating officer found no signs of tampering at the window, but after knocking on the door and receiving no response, the officer found the door unlocked when he tested the handle.[17] The court concluded it was reasonable for the officer, believing a burglar might be hiding in the house, to search without a warrant those areas of the house where a burglar might be hiding.[18]

In *Hill v. Com.*,[19] the court similarly found that officers reasonably believed a burglar might be in a house that was the subject of a warrantless search. A neighbor reported that the occupant of the house had been out of town for 2 days and that the front door of his house was open. When the officers arrived, they observed that the front door was ajar approximately 12 to 15 inches and that no one answered the door when they rang the doorbell and knocked on the storm door.[20] The court found that under such circumstances, it was reasonable to search without a warrant those places inside the house where a burglar might hide.[21]

The court in *Hill* explained that the situation of a possible burglary in progress required prompt action and an immediate, warrantless entry. It was the officers' duty to determine if the house had been burglarized, to apprehend any burglar, and to resecure the premises.[22] It would have been impractical, the court noted, for one officer to go for a warrant while the other attempted to secure the premises from all sides.[23]

---

[17] *Id.*

[18] *Id.*

[19] *Hill v. Com.*, 18 Va. App. 1, 441 S.E.2d 50 (1994). See, also, e.g., *Love v. State*, 290 Ga. App. 486, 659 S.E.2d 835 (2008).

[20] *Hill v. Com., supra* note 19.

[21] *Id.*

[22] *Id.*

[23] *Id.*

In contrast to *State ex rel. Zander* and *Hill*, in *United States v. Selberg*,[24] the court held there were insufficient facts for a reasonable officer to believe that warrantless entry was appropriate. The neighbor who called the police saw the occupant leave the door open when he left, observed that the door remained open the following day, and observed that the occupant's car was still gone. No occupant answered to knocks on the door.[25] The court found that under such facts, the warrantless search of the home was unreasonable.[26]

We find no clear error in the trial court's findings concerning the historical facts. Ezell told Wackler that Salvador Rodriguez and Anguiano, who leased the house, were out of town, and that she and her child were the only occupants in the house before they went for a walk. Ezell told Wackler that when they left for their walk, they turned off all the lights in the house and locked the doors. Ezell told Wackler that when they returned, they saw someone in the garage and all the lights in the house were on. Wackler and Heath confirmed that the lights of the house were on, and they found that the front door of the house was unlocked and not entirely shut.

In our de novo review, we agree with the trial court that these facts, taken together with rational inferences therefrom, reasonably warranted an immediate intrusion of the Salvador Rodriguez house into areas where a burglar might be hiding. The officers had reasonable grounds to believe that there was an emergency requiring an immediate warrantless search of the house. The trial court did not err in overruling Salvador Rodriguez' motion to suppress.

## 2. Drug Use as Prior Bad Act

Salvador Rodriguez' second assignment of error concerns Ezell's testimony that she smoked methamphetamine

---

[24] *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980). See, *State ex rel. Zander v. District Court, supra* note 16; *Hill v. Com., supra* note 19.

[25] *United States v. Selberg, supra* note 24.

[26] *Id.*

with Salvador Rodriguez and other guests and that Salvador Rodriguez provided the methamphetamine which he kept underneath his basement couch. Salvador Rodriguez argues that the court committed error because the testimony was admitted as intrinsic evidence rather than as other acts evidence admitted for a proper purpose under rule 404(3). Specifically, he argues he was prejudiced by a lack of an instruction to the jury to consider the evidence only for its proper purpose.

[12] We find no error in the trial court's determination that Ezell's testimony was direct evidence of the crime charged and thus outside the purview of rule 404. Rule 404(2) concerns "[e]vidence of other crimes, wrongs, or acts." Other acts under rule 404(2) are acts that are not part of the events giving rise to the present charges.[27]

Salvador Rodriguez was charged with possession of methamphetamine with intent to deliver "on or about" July 30, 2014, the date when officers found methamphetamine underneath Salvador Rodriguez' basement couch. Defense counsel objected to Ezell's testimony that during the summer of 2014, she had observed Salvador Rodriguez in possession of methamphetamine which he kept underneath the basement couch.

[13-16] The phrase "on or about" in an information indicates the date with approximate certainty.[28] Furthermore, the crime of "possession" may extend over a period of time if uninterrupted.[29] Absent language indicating differently, "possession" within a criminal statute contemplates a continuing offense as opposed to a single incident.[30] There is no indication

---

[27] *U.S. v. Gorman*, 312 F.3d 1159 (10th Cir. 2002). See *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015). See, also, e.g., *U.S. v. Carboni*, 204 F.3d 39 (2d Cir. 2000); *U.S. v. Kinshaw*, 71 F.3d 268 (8th Cir. 1995); *U.S. v. Soliman*, 813 F.2d 277 (9th Cir. 1987); *U.S. v. Fortenberry*, 971 F.2d 717 (11th Cir. 1992).

[28] See *State v. Metzger*, 199 Neb. 186, 256 N.W.2d 691 (1977).

[29] *State v. Williams*, 211 Neb. 650, 319 N.W.2d 748 (1982).

[30] See *id.*

the Legislature intended that possession of methamphetamine should always be a single incident rather than a continuing offense. An offense is continuing if

> "set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy; an offense which continues day by day; a breach of the criminal law, not terminated by a single act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences."[31]

[17] In *U.S. v. Towne*,[32] the court held that evidence of the defendant's possession of a pistol on days other than the date described in the information charging him with being a felon in unlawful possession of a pistol was not evidence of other acts within the meaning of Fed. R. Evid. 404(b), the federal equivalent to our rule 404(2). The continuous possession of the gun, the court explained, constituted a single offense. And evidence of uncharged criminal activity is not considered "'other crimes'" evidence under that rule if it "'arose out of the same transaction or series of transactions.'"[33]

Justice Cassel in his concurring opinion in *State v. Freemont*[34] discussed several analogous cases holding that evidence of possession on dates other than those specified in the information is direct evidence of the charged crime of possession rather than other acts evidence.[35] The defendant in *Freemont* was charged with second degree murder. In addition,

[31] *Id.* at 655, 319 N.W.2d at 751, quoting 22 C.J.S. *Criminal Law* § 1 (1961).

[32] *U.S. v. Towne*, 870 F.2d 880 (2d Cir. 1989). Compare *U.S. v. Bowie*, 232 F.3d 923 (D.C. Cir. 2000) (affirmative evidence that is not same item previously observed).

[33] See *U.S. v. Towne, supra* note 32, 870 F.2d at 886.

[34] *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012) (Cassel, J., concurring).

[35] See, *U.S. v. Dorsey*, 677 F.3d 944 (9th Cir. 2012); *U.S. v. Adams*, 604 F.3d 596 (8th Cir. 2010); *United States v. Mitchell*, 613 F.2d 779 (10th Cir. 1980).

he was charged with use and possession of a deadly weapon. Justice Cassel reasoned that evidence that the defendant had been seen a week prior with a gun similar to the one used in the shooting bore directly on an element of the possession charge and therefore was not other acts evidence. Noting that the crime of possession stated in the information was committed "'on or about'" the date specified, he concluded that the evidence of the possession days before was "not so removed in time as to lose its temporal connection to the charged date of possession."[36]

The majority in *Freemont* held that the evidence of the defendant's possession of a gun before the date specified in the information was other acts evidence. But we failed to discuss the concept of continuing possession. We have since explained that our holding in *Freemont* is limited to circumstances where the offense of possession is entirely different from the most serious charged offense.[37] That is not the situation presented here.

We find the reasoning in *Towne*[38] is applicable to this case. Ezell's testimony supports the inference that in July 2014, Salvador Rodriguez gradually consumed with his acquaintances a stash of methamphetamine that he kept in his basement.

In the objected-to testimony, Ezell did not testify that Salvador Rodriguez had committed on unrelated occasions the crime of possession of methamphetamine with intent to deliver, such that he had the character trait of being the type of person who possesses methamphetamine with intent to deliver. Rather, Ezell's testimony was direct evidence that on or about July 30, 2014, Salvador Rodriguez was engaged in a series of transactions constituting the crime of possession of

---

[36] *State v. Freemont, supra* note 34, 284 Neb. at 212, 213, 817 N.W.2d at 303, 304 (Cassel, J., concurring).

[37] *State v. Cullen, supra* note 27.

[38] *U.S. v. Towne, supra* note 32.

methamphetamine with intent to deliver. This is not other acts evidence. Ezell's testimony did not require an intermediate propensity inference in order for the trier of fact to have concluded based on that testimony that Salvador Rodriguez committed the crime charged. The court did not err in overruling defense counsel's rule 404 objection.

### 3. Comments in Closing Arguments

[18] Salvador Rodriguez asserts there was prosecutorial misconduct in closing arguments. But the closing arguments were not recorded in the bill of exceptions. It is the law in Nebraska that, where allegedly prejudicial remarks of counsel do not appear in the bill of exceptions, this court is precluded from considering an assigned error concerning such remarks.[39] We mentioned in *State v. Harris*[40] that counsel could have made an offer or proof when closing arguments were not in the record. But here, the only "evidence" of the statements made in closing arguments is an affidavit attached to the motion for new trial in which the defense attorney avers that the factual allegations in the motion are true.

[19,20] It has long been the law of this state that affidavits in support of a motion for new trial must be offered in evidence and preserved in and made a part of a bill of exceptions to be considered by this court.[41] This court will not review testimony in the form of affidavits used in the trial court on the hearing of a motion for new trial, unless such affidavits have been included in and presented by a bill of exceptions.[42]

Salvador Rodriguez argues he was unfairly prejudiced when the prosecutor said in closing arguments that Salvador

---

[39] *State v. Harris*, 205 Neb. 844, 290 N.W.2d 645 (1980).

[40] See *id*.

[41] *Metschke v. Department of Motor Vehicles*, 186 Neb. 197, 181 N.W.2d 843 (1970), *overruled on other grounds, State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990).

[42] *Id.*

Rodriguez owned the house where the methamphetamine was found. Defense counsel averred that in his closing arguments, he corrected this and told the jury that Salvador Rodriguez was only a tenant and had no legal ownership in the house. Even assuming the prosecution made the statements alleged, the prosecutor's remarks were not misconduct and Salvador Rodriguez was not prejudiced. The ownership of the house was not decisive of any issue in the case, and there was no allegation that the prosecutor told the jury that ownership of the residence was relevant to the crimes charged. We find no merit to this last assignment of error.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.