Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/14/2022 09:07 AM CDT

State of Nebraska, appellee, v.
Dustin L. Miller, appellant.

___ N.W.2d ___

Filed July 22, 2022.    No. S-21-343.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. And where the facts are largely undisputed, the ultimate question is an issue of law.

2. **Confessions: Appeal and Error.** A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous.

3. **Motions to Suppress: Appeal and Error.** In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion.

4. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

5. **Sentences: Appeal and Error.** A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.

6. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

7. **Constitutional Law: Search and Seizure: Blood, Breath, and Urine Tests.** The drawing of blood from a person's body for the purpose of administering blood tests is a search of the person subject to Fourth Amendment constraints.

8. **Constitutional Law: Search and Seizure: Warrantless Searches.** Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.

9. **Warrantless Searches.** The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

10. **Warrantless Searches: Proof.** It is the State's burden to show that a search falls within an exception to the warrant requirement.

11. **Warrantless Searches: Police Officers and Sheriffs: Time.** As a general matter, the exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant.

12. **Convictions: Confessions: Due Process.** A defendant in a criminal case is deprived of due process of law if his or her conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession.

13. **Confessions: Police Officers and Sheriffs: Proof.** Under *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), trial courts must institute fair procedures to determine whether a confession is voluntary, because involuntary or coerced confessions cannot be introduced into evidence. At such a hearing, the State has the burden to prove a defendant's statement was voluntary and not coerced. In making this determination, a totality of the circumstances test is applied, and factors to consider include the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne.

14. **Confessions: Police Officers and Sheriffs.** Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.

15. **Confessions.** The question for purposes of a hearing under *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), is whether an admission or confession was voluntary, not whether it was

true, so questions going to the substance of a statement generally fall outside the scope of such hearing.

16. **Trial: Evidence.** The rule of completeness is concerned with the danger of admitting a statement out of context, and when this danger is not present, it is not an abuse of discretion for the trial court to fail to require the production of the remainder of the document or statement.

17. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

18. **Trial: Convictions: Evidence.** When the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

19. **Drunk Driving: Convictions: Circumstantial Evidence.** One accused of a crime, including the crime of driving under the influence, may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence established guilt beyond a reasonable doubt.

20. **Sentences.** The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

21. ____. When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

Joseph D. Nigro, Lancaster County Public Defender, and Todd Molvar for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

STACY, J.

After a jury trial, Dustin L. Miller was convicted and sentenced for driving under the influence (DUI), fourth offense, and driving during revocation, second offense. In this direct appeal, he contends the trial court erred by failing to suppress the results of a warrantless blood test and by making certain evidentiary rulings regarding statements Miller made to police. He also contends there was insufficient evidence to support his convictions, and he argues his sentences are excessive. Finding no merit to Miller's assigned errors, we affirm.

## I. BACKGROUND

On or about February 25, 2020, police discovered Miller lying unconscious in a ditch at the scene of a single-vehicle accident. Miller was transported by ambulance to a hospital, where medical staff performed a warrantless blood draw, at the request of police. The test result showed that Miller had a blood alcohol content of .254 grams of alcohol per 100 milliliters of blood.

In November 2020, Miller was charged with DUI, .15 or over, with three prior convictions (a Class IIA felony), and driving during revocation, subsequent offense (a Class IIA felony).

### 1. Motion to Suppress

Miller moved to suppress the results of the blood test, arguing the warrantless blood draw was an unconstitutional search in violation of the U.S. and Nebraska Constitutions. Officer Zachary Kliegl testified at the suppression hearing.

Kliegl testified that at approximately 1 a.m. on February 25, 2020, he was on duty and driving eastbound near 40th Street and Highway 2 in Lincoln, Nebraska. He noticed a pickup truck in the ditch on the southeast corner of the intersection that looked like it had collided with a streetlight and rolled into the ditch. Kliegl activated his cruiser's overhead lights and stopped to inspect the accident. He determined the pickup truck was heavily damaged, unoccupied, and smelled

of alcohol. He observed debris scattered nearby, including an open can of beer.

Kliegl eventually discovered Miller lying in the ditch under some debris, approximately 100 feet west of the vehicle. Miller appeared to be in and out of consciousness. Kliegl asked Miller "if he was okay and if there was anybody else that was in the vehicle with him." Miller moaned or grunted something in response, which Kliegl interpreted as a "yes." Based on that response, Kliegl walked back toward the vehicle to search for others who might be injured. He did not find anyone else, so he returned to Miller and asked again whether there were others in the vehicle. This time, Miller responded that he was the only one in the vehicle. The events at the accident scene were recorded by a video camera in Kliegl's cruiser.

Miller was transported to a hospital by ambulance, and Kliegl followed in his cruiser, leaving other officers at the scene. When Kliegl arrived at the hospital, staff were preparing to take Miller for x rays. Kliegl waited in the hospital room until Miller was returned. At that point, Miller was snoring and unresponsive. Medical personnel informed Kliegl that Miller had fractured vertebrae in his neck and back, and it was necessary to commence medical treatment "right away," including administering fluids that could possibly alter his blood alcohol content.

Kliegl had formed an opinion that Miller was operating a motor vehicle while under the influence of alcohol. His opinion was based on Miller's general condition when discovered, as well as the facts that Miller was the only one found at the accident scene, a preliminary investigation showed the pickup truck was registered to Miller's mother, an open beer can was found at the scene, and Kliegl smelled alcohol on Miller and in the pickup truck at the scene. Kliegl testified that in his experience, obtaining a warrant for a blood draw could take around 3 hours. He did not think he had enough time to obtain a warrant under the circumstances, due to the extent of Miller's injuries and the need for medical staff to treat him with fluids that could affect his blood alcohol content.

Kliegl directed medical staff to perform a blood draw on Miller immediately, and they did so. Before the blood draw, Kliegl read aloud the standard consent for blood draw, but Miller was not conscious at the time, and there is no contention that Miller actually consented to the blood draw.

On cross-examination, Kliegl testified that he was aware a county court judge was always on call to review requests for warrants and that he was aware the hospital had a substation he could have used to draft such a request. He also testified that he was not working the accident alone; two other officers were with him at the hospital, and other officers were present at the accident scene.

Based on the evidence adduced at the suppression hearing, the State argued the warrantless blood draw was validly obtained because the situation triggered the exigent circumstances exception to the Fourth Amendment.[1] The defense disagreed, arguing that even though Miller was unconscious, law enforcement could have, and should have, obtained a warrant for Miller's blood sample.

The district court made an express finding that Kliegl's testimony was credible and that it established the existence of exigent circumstances which justified the warrantless blood draw. The court therefore overruled the motion to suppress and ordered Miller to appear for trial in approximately 2 weeks.

## 2. *Jackson v. Denno*

Miller filed a pretrial motion requesting a *Jackson v. Denno*[2] hearing to determine whether the State intended to offer evidence of any admissions or confessions Miller made to law enforcement officers and, if so, to hold an evidentiary hearing to determine admissibility. The motion was taken up just prior to Kliegl's testimony at trial, outside the presence of the jury.

---

[1] See, *Mitchell v. Wisconsin*, ___ U.S. ___, 139 S. Ct. 2525, 204 L. Ed. 2d 1040 (2019); *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013); *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021).

[2] *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964).

The State advised the court that it intended to offer evidence of Miller's statements to Kliegl at the scene, and it proceeded to offer evidence regarding such statements. Kliegl testified that he asked Miller several questions at the scene, including "if he was okay," "if he was the driver of the vehicle," and "if he was injured." Kliegl described that initially, Miller was "just, like, kind of groaning" in response to the questions. When Kliegl asked Miller if there was anyone else in the vehicle with him, he "believe[d] it sounded like [Miller] said, yes." But after searching and finding no one else at the accident scene, Kliegl asked Miller again whether there was anyone else in the vehicle with him. This time, Miller gave what Kliegl described as a "more definite answer," indicating that no one was with him. Kliegl was not sure whether Miller understood his questions initially, but he believed that Miller understood the question being asked when he responded more definitively that there was nobody else in the vehicle. Kliegl testified that he did not make any threats or promises to get Miller to speak with him at the scene and that Miller appeared to be speaking freely and voluntarily.

The audio-video recorder in Kliegl's cruiser captured Kliegl's questions and Miller's responses at the accident scene, and the recording was received into evidence and played for the court. That exhibit shows Kliegl arriving on the scene, and he can be heard asking Miller several questions including, "You alright?"; "[A]nybody else with you?"; and "[W]hat's your name?" Miller responded to these questions with an audible groan. Kliegl asked again, "Did you have a passenger with you?" Miller responded with two short moans, to which Kliegl replied, "You did? Male? Female?" and Miller moaned again in response. About 1 minute later, Kliegl returned and asked, "My man . . . [w]as anybody else in the truck with you?" This time Miller responded, "What?" and then replied, "No." Kliegl then confirmed, "No? Just you?" Miller responded with a moan.

After reviewing the exhibit, the court ruled from the bench. As to Miller's responses of "What?" and "No" to Kliegl's question about whether anyone else was in the pickup truck with him, the court found that Miller made the statements, that he understood what he was saying, and that the statements were freely and voluntarily made under all the circumstances and were not the product of any coercion, promise, or inducement, direct or indirect.

After the court's ruling, the State sought clarification about Miller's other responses and whether the entire video exhibit could be played for the jury. The court stated, "You'll have to redact those other statements, as I cannot make a determination that [Miller] understood what he was saying when he made [the] initial statements." In response to the court's clarification, Miller told the court that he had no objection to the earlier responses, and he asked to be allowed to publish the entire video exhibit to the jury pursuant to the rule of completeness.[3] The court refused that request.

### 3. Jury Trial

The evidence adduced at trial was consistent with that described above. In addition, Kliegl testified that Miller was the only person he discovered at the accident scene and that no one else was observed walking near the accident scene. He also testified that when other officers arrived to assist, a search was made for other individuals and none were found.

Kliegl also testified that in his opinion, based on the evidence and his observations and training, Miller was under the influence of alcohol at the time of the accident. The parties stipulated that Miller's operator's license had been revoked for a period of 15 years, from December 6, 2016, to December 6, 2031.

At the start of trial, Miller made a continuing objection to "Kliegl testifying or a video being played where . . . Miller

---

[3] Neb. Rev. Stat. § 27-106 (Reissue 2016).

admits to being the driver of the vehicle at issue in this case." This objection was overruled. When the State offered a redacted copy of Kliegl's cruiser's video containing only Miller's statement that nobody else was in the vehicle with him, Miller objected based on the "involuntariness" of the statement. He also objected to the court's refusal to allow the unredacted video under the rule of completeness. The objections were overruled, and the redacted exhibit was received and played for the jury. Miller then made an offer of proof which included the unredacted video.

During trial, Kliegl testified, without objection, about what Miller said at the accident scene. Kliegl testified that when he initially asked Miller if there was someone else in the vehicle, Miller responded with "like a grunt, like towards a yes." Kliegl then testified that when he asked the same question again later, Miller responded with "just a definitive 'No.'" On cross-examination, Kliegl admitted that the first few times he asked Miller questions at the scene, "all [he got] back [were] unintelligible moans."

When the State offered the result of Miller's blood test into evidence, Miller objected based on the prior motion to suppress. The court overruled the objection, and the test result was received into evidence. The parties stipulated that the blood test was otherwise properly obtained and maintained in compliance with "Title 177."

At the conclusion of the State's evidence, Miller moved for a directed verdict on both counts. The court overruled the motion. Miller did not testify, and he put on no evidence. A jury instruction conference was held, and there were no objections to the court's instructions or the verdict forms.

Regarding the DUI charge, the jury was instructed that it could return one of three possible verdicts: (1) not guilty, (2) guilty of DUI and/or when having a concentration of .08 of 1 gram or more by weight of alcohol per 100 milliliters of blood, or (3) guilty of DUI while having a concentration of .15 of 1 gram or more by weight of alcohol per 100 milliliters of

blood. Additionally, with respect to Miller's statements to law enforcement, the jury was instructed:

> There has been evidence that [Miller] made a statement to a law enforcement officer. You may rely on any such statement only if you decide beyond a reasonable doubt with regard to each statement:
>
> (1) that [Miller] made the statement; and
>
> (2) that [Miller] understood what he was saying; and
>
> (3) that the statement was freely and voluntarily made under all the circumstances surrounding its making.
>
> If you decide that the State did not prove these three things beyond a reasonable doubt, then you must disregard the statement, even if you think it is true.

In closing, the defense argued there was insufficient evidence that Miller was operating the vehicle when it crashed and that without such evidence, Miller could not be convicted of either charge. The defense also emphasized Kliegl's testimony that Miller was "moaning [and] not making very much sense," and it argued the State had failed to prove beyond a reasonable doubt that Miller understood what he was saying when he told Klieigl that he was the only person in the vehicle.

## 4. Verdicts and Sentencing

The jury returned a verdict finding Miller guilty of non-aggravated DUI (blood alcohol content of .08 or more). It also found him guilty of driving during revocation. After an enhancement hearing at which the State proved Miller had three prior DUI convictions and one prior conviction for driving during revocation, Miller was found guilty of DUI, fourth offense, and driving during revocation, second offense. He was sentenced to imprisonment for not less than 3 years nor more than 3 years on the DUI conviction and to a consecutive term of imprisonment for 3 to 5 years on the conviction for driving during revocation, subsequent offense. Miller's operator's license was revoked for a period of 15 years following his

release from incarceration, and he was authorized to obtain an ignition interlock permit after 2 years.

Miller filed this timely appeal, which we moved to our docket on our own motion.[4]

## II. ASSIGNMENTS OF ERROR

Miller assigns, restated, that the district court erred in (1) overruling his motion to suppress, (2) finding that any of his statements at the accident scene were made freely and voluntarily, (3) overruling his request to admit excluded statements under the rule of completeness, (4) finding the evidence was sufficient to sustain his convictions, and (5) abusing its discretion by imposing excessive sentences.

## III. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress evidence based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review.[5] Regarding historical facts, we review the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[6] And where the facts are largely undisputed, the ultimate question is an issue of law.[7]

[2,3] A district court's finding and determination that a defendant's statement was voluntarily made will not be set aside on appeal unless this determination is clearly erroneous.[8] In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes

---

[4] See Neb. Rev. Stat. § 24-1106(3) (Reissue 2020).

[5] *State v. Short*, 310 Neb. 81, 964 N.W.2d 272 (2021).

[6] *Id.*

[7] *State v. Salvador Rodriguez*, 296 Neb. 950, 898 N.W.2d 333 (2017); *State v. Modlin*, 291 Neb. 660, 867 N.W.2d 609 (2015).

[8] *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000).

the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion.[9]

[4] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[10] The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[11]

[5,6] A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court.[12] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[13]

## IV. ANALYSIS

### 1. Motion to Suppress

In his first assignment of error, Miller argues the district court should have granted his motion to suppress the results of the warrantless blood test.

[7-9] It has long been recognized that the drawing of blood from a person's body for the purpose of administering blood tests is a search of the person subject to Fourth

---

[9] *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996).

[10] *State v. Davis*, 310 Neb. 865, 969 N.W.2d 861 (2022); *State v. Williams*, 306 Neb. 261, 945 N.W.2d 124 (2020).

[11] *Id.*

[12] *State v. Blake*, 310 Neb. 769, 969 N.W.2d 399 (2022).

[13] *Id.*

Amendment constraints.[14] Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures.[15] Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions.[16] The warrantless search exceptions Nebraska has recognized include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.[17]

[10,11] It is the State's burden to show that a search falls within an exception to the warrant requirement.[18] In this case, the State relies exclusively on the exigent circumstances exception to justify the reasonableness of the warrantless blood draw. As a general matter, the exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant.[19] Miller contends the State failed to meet its burden to prove exigent circumstances on this record, basically arguing that Kliegl and the other officers had sufficient time to secure a search warrant, and should have done so.

In the context of a warrantless blood draw in a DUI case, this court has discussed,[20] but not previously applied, the

---

[14] *Modlin, supra* note 7. See, also, *Birchfield v. North Dakota*, 579 U.S. 438, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016); *McNeely, supra* note 1; *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989); *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966).

[15] *Briggs, supra* note 1.

[16] *Id.*

[17] *Id.*

[18] E.g., *id.*

[19] See, *Birchfield, supra* note 14; *McNeely, supra* note 1. See, also, *State v. Eberly*, 271 Neb. 893, 716 N.W.2d 671 (2006).

[20] See *State v. McCumber*, 295 Neb. 941, 893 N.W.2d 411 (2017) (noting exigent circumstances may authorize warrantless blood test).

exigent circumstances exception. Both parties rely on U.S. Supreme Court precedent applying the exigent circumstances exception in this context. We summarize those cases before analyzing the parties' arguments.

### (a) *Schmerber v. California*

The U.S. Supreme Court first addressed exigent circumstances and warrantless blood draws in *Schmerber v. California*,[21] decided in 1966. In *Schmerber*, the defendant was injured in an automobile accident and taken to a hospital. At the direction of a police officer, a blood sample was taken from the defendant, which showed he was intoxicated. At his DUI trial, the defendant objected to the admission of the blood test results, arguing it violated his Fourth Amendment right to be free from an unreasonable search and seizure. *Schmerber* held the blood draw was a search "within the meaning of [the Fourth] Amendment,"[22] and it concluded the "questions we must decide" are "whether the police were justified in requiring petitioner to submit to the blood test" and "whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness."[23]

In this respect, *Schmerber* noted there was probable cause to arrest the defendant for DUI, because the arresting officer smelled alcohol on his breath and noticed his eyes were bloodshot and watery. It also found, "The officer in the present case . . . might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'"[24] The Court then stated:

> We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body

---

[21] *Schmerber, supra* note 14.

[22] *Id.*, 384 U.S. at 767.

[23] *Id.*, 384 U.S. at 768.

[24] *Id.*, 384 U.S. at 770.

functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.[25]

The Court in *Schmerber* emphasized that although it found no violation of the Fourth Amendment, it "reach[ed] this judgment only on the facts of the present record."[26]

After *Schmerber*, a split of authority developed on whether the natural dissipation of alcohol in the bloodstream established a per se exigency that sufficed, on its own, to justify warrantless blood tests in DUI investigations.[27] The U.S. Supreme Court granted certiorari in *Missouri v. McNeely*[28] to "resolve [that] split."[29]

### (b) *Missouri v. McNeely*

In *McNeely*, the Supreme Court rejected the suggestion that the natural metabolization of alcohol in the bloodstream presents a per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk driving cases. The Court explained:

---

[25] *Id.*, 384 U.S. at 770-71.

[26] *Id.*, 384 U.S. at 772.

[27] Compare, e.g., *State v. Johnson*, 744 N.W.2d 340 (Iowa 2008) (holding *Schmerber* did not stand for proposition that loss of evidence through dissipation of alcohol from suspect's body was sufficient exigency alone to justify warrantless blood draw), and *State v. Rodriguez*, 156 P.3d 771 (Utah 2007) (same), with *State v. Shriner*, 751 N.W.2d 538 (Minn. 2008) (holding natural dissipation of blood alcohol evidence alone constitutes per se exigency under *Schmerber*) and *State v. Bohling*, 173 Wis. 2d 529, 494 N.W.2d 399 (1993) (same).

[28] *McNeely, supra* note 1.

[29] *Id.*, 569 U.S. at 147.

It is true that as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated. . . . Regardless of the exact elimination rate, it is sufficient for our purposes to note that because an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results. This fact was essential to our holding in *Schmerber*, as we recognized that, under the circumstances, further delay in order to secure a warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence. . . .

But it does not follow that we should depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State and its *amici*. In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. . . . We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the "considerable overgeneralization" that a *per se* rule would reflect.[30]

The *McNeely* majority thus declined to adopt a per se rule regarding exigency, reasoning that doing so would be inconsistent with the "careful case-by-case assessment of exigency"

---

[30] *Id.*, 569 U.S. at 152-53, quoting *Richards v. Wisconsin*, 520 U.S. 385, 117 S. Ct. 1416, 137 L. Ed. 2d 615 (1997).

required by the totality of the circumstances test.[31] "In short," the *McNeely* majority held, "while the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically."[32]

Justice Thomas dissented in *McNeely*, reasoning that "[t]he rapid destruction of evidence acknowledged by the parties, the majority, and *Schmerber*'s exigency determination occurs in *every* situation where police have probable cause to arrest a drunk driver."[33] The dissent urged the Court to adopt a rule recognizing that "the natural metabolization of blood alcohol concentration (BAC) creates an exigency once police have probable cause to believe the driver is drunk."[34]

### (c) *Mitchell v. Wisconsin*

In the 2019 case of *Mitchell v. Wisconsin*,[35] the U.S. Supreme Court considered how the exigent circumstances exception applies when a suspected drunk driver is unconscious and therefore cannot be given a standard breath test. In *Mitchell*, the police received a report that the defendant, appearing to be very intoxicated, had gotten into a vehicle and driven off. Police found the defendant wandering near a lake, and a preliminary breath test showed his blood alcohol level was triple the legal limit for driving. He was arrested and transported to a police station for additional testing.

During transport, the defendant became lethargic and eventually lost consciousness, so police took him to a hospital. Once there, police read aloud the standard advisement and directed the medical staff to draw a blood sample for testing. The sample was drawn approximately 90 minutes postarrest, and the

---

[31] *McNeely, supra* note 1, 569 U.S. at 152.

[32] *Id.*, 569 U.S. at 156.

[33] *Id.*, 569 U.S. at 178 (Thomas, J., dissenting).

[34] *Id.*

[35] *Mitchell, supra* note 1.

defendant remained unconscious while the sample was taken. Test results showed the defendant's blood alcohol content was .222. He was charged and convicted of drunk driving offenses after unsuccessfully moving to suppress the results of the blood test. The Wisconsin Supreme Court affirmed his convictions, and the U.S. Supreme Court granted certiorari, describing the issue as "how the [exigent circumstances] exception bears on the category of cases . . . involving unconscious drivers."[36] Writing for the four-justice plurality, Justice Alito described the issue and the holding as follows:

> Today, we consider what police officers may do in a narrow but important category of cases: those in which the driver is unconscious and therefore cannot be given a breath test. In such cases, we hold, the exigent-circumstances rule almost always permits a blood test without a warrant.[37]

Justice Thomas concurred with the plurality's holding, reiterating his position in *McNeely* that the natural metabolization of alcohol in the bloodstream creates an exigency per se whenever there is probable cause to believe a driver is drunk.

The *Mitchell* plurality reasoned that the facts of cases involving unconscious drivers sat "much higher than *McNeely* on the exigency spectrum," reasoning that the defendant's medical condition "heightened the urgency" of performing the blood test.[38] It particularly noted that due to the defendant's condition, he was unable to be subjected to the "'standard evidentiary breath test'" conducted at the police station:[39]

> When a breath test is impossible, enforcement of the drunk-driving laws depends upon the administration of a blood test. And when a police officer encounters an unconscious driver, it is very likely that the driver would

---

[36] *Id.*, 139 S. Ct. at 2534-35.

[37] *Id.*, 139 S. Ct. at 2531.

[38] *Id.*, 139 S. Ct. at 2533.

[39] *Id.*, 139 S. Ct. at 2534.

be taken to an emergency room and that his blood would be drawn for diagnostic purposes even if the police were not seeking BAC information. In addition, police officers most frequently come upon unconscious drivers when they report to the scene of an accident, and under those circumstances, the officers' many responsibilities—such as attending to other injured drivers or passengers and preventing further accidents—may be incompatible with the procedures that would be required to obtain a warrant. Thus, when a driver is unconscious, the general rule is that a warrant is not needed.[40]

*Mitchell* held there is a "'compelling need'" for a blood test of drunk driving suspects whose condition renders them unable to perform the standard breath test.[41] And it emphasized that although constant dissipation of blood alcohol levels is not alone enough to create an exigency, it can be enough "when combined with other pressing needs."[42] The *Mitchell* plurality explained that "exigency exists when (1) BAC evidence is dissipating and (2) some other factor creates pressing health, safety, or law enforcement needs that would take priority over a warrant application."[43] And it reasoned that both these conditions are met when a drunk driving suspect is unconscious:

Indeed, unconsciousness does not just create pressing needs; it is *itself* a medical emergency. It means that the suspect will have to be rushed to the hospital or similar facility not just for the blood test itself but for urgent medical care. Police can reasonably anticipate that such a driver might require monitoring, positioning, and support on the way to the hospital; that his blood may be drawn anyway, for diagnostic purposes, immediately on arrival; and that immediate medical treatment could delay (or

---

[40] *Id.*, 139 S. Ct. at 2531.

[41] *Id.*, 139 S. Ct. at 2537.

[42] *Id.*

[43] *Id.*

otherwise distort the results of) a blood draw conducted later, upon receipt of a warrant, thus reducing its evidentiary value.[44]

And *Mitchell* further held:

> When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment. We do not rule out the possibility that in an unusual case a defendant would be able to show that his blood would not have been drawn if police had not been seeking BAC information, and that police could not have reasonably judged that a warrant application would interfere with other pressing needs or duties. Because Mitchell did not have a chance to attempt to make that showing, a remand for that purpose is necessary.[45]

With the holdings and reasoning from *Schmerber*, *McNeely*, and *Mitchell* in mind, we turn next to whether the State sufficiently proved exigent circumstances in this case. In doing so, we consider both the evidence adduced at the motion to suppress and the evidence offered at trial.[46]

### (d) State Proved Exigent Circumstances

Here, the relevant facts are largely undisputed. Kliegl discovered Miller lying in the ditch, surrounded by debris from a rollover accident. Miller smelled of alcohol, the wrecked vehicle smelled of alcohol, and an open can of beer was found among the debris. Miller was in and out of consciousness at

---

[44] *Id.*, 139 S. Ct. at 2537-38.

[45] *Id.*, 139 S. Ct. at 2539.

[46] *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019) (when motion to suppress is denied pretrial and objection is preserved at trial, appellate court considers all evidence from both trial and suppression hearings).

the scene and was transported to the hospital for emergency medical care. At the hospital, Miller was unconscious and not communicating. Kliegl was advised by medical staff that Miller's injuries were serious and required immediate medical treatment, including treatment that could affect Miller's blood alcohol level. Based on Kliegl's investigation, it was his opinion that Miller had been operating a vehicle under the influence of alcohol. Kliegl did not think he had sufficient time to obtain a warrant for a blood test, so he directed medical staff to perform a blood draw for purposes of testing, which they did.

The district court expressly found that the facts were as testified to by Kliegl and that his testimony was credible in all respects. We have reviewed those factual findings for clear error, and find none. And when we independently consider whether these facts support a finding of exigent circumstances sufficient to support a warrantless blood draw,[47] we conclude they do.

This case presents a textbook case of exigent circumstances under *Mitchell*. As that case recognized, "[w]hen a breath test is impossible, enforcement of the drunk-driving laws depends upon the administration of a blood test."[48] Here, there was no evidence that officers attempted to administer a standardized breath test to Miller either at the scene or at the hospital, but the record strongly suggests this was so because Miller, like the driver in *Mitchell*, was physically incapable of performing such a test. He was in and out of consciousness at the accident scene and was unconscious at the hospital. Miller's unconsciousness was itself a medical emergency,[49] and his need for immediate medical treatment that could affect his blood alcohol level created a pressing need to perform the blood draw immediately. Considering the totality of the circumstances, Kliegl

---

[47] See *Short, supra* note 5.

[48] *Mitchell, supra* note 1, 139 S. Ct. at 2531.

[49] See *Mitchell, supra* note 1.

could reasonably have believed that he was confronted with an emergency in which the delay necessary to obtain a warrant for a blood draw would not only postpone necessary medical treatment, but would also result in the threatened destruction of evidence.

On this record, the district court did not err in finding that exigent circumstances had been proved, and the warrantless blood test was reasonable for purposes of the Fourth Amendment.

## 2. *Jackson v. Denno*

[12-14] A defendant in a criminal case is deprived of due process of law if his or her conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession.[50] In *Jackson v. Denno*,[51] the U.S. Supreme Court held that a "defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." Trial courts must institute fair procedures to determine whether a confession is voluntary, because involuntary or coerced confessions cannot be introduced into evidence.[52] At such a hearing, the State has the burden to prove a defendant's statement was voluntary and not coerced.[53] In making this determination, a totality of the circumstances test is applied, and factors to consider include the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will to be easily overborne.[54] And we have

---

[50] *Jackson v. Denno, supra* note 2.

[51] *Id.*, 378 U.S. at 380. See, D*ickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000); *State v. Seberger*, 279 Neb. 576, 779 N.W.2d 362 (2010).

[52] *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016). See *Jackson v. Denno, supra* note 2.

[53] *Garner, supra* note 8.

[54] *State v. Goodwin*, 278 Neb. 945, 774 N.W.2d 733 (2009).

repeatedly held that coercive police activity is a necessary predicate to a finding that a confession is not voluntary.[55]

Miller filed a motion pursuant to *Jackson v. Denno* seeking a determination of the admissibility of "any admissions or confessions" he made to law enforcement. At the hearing on his motion, both Miller and the State asked the court to take an "all or nothing" approach to any statements Miller made at the accident scene. In other words, the parties asked the court to determine that either all of Miller's statements were voluntary and admissible or none of them were. Presumably due to the manner in which the issue was presented by the parties, the district court considered the admissibility, under *Jackson v. Denno*, of all of Miller's responses to Kliegl's questions at the accident scene. This necessarily included what we will refer to as Miller's "initial responses" (described by Kliegl as groans which he interpreted as statements that there were others in the vehicle with him), as well as what we will refer to as Miller's "subsequent statements" ("What?" and "No") in response to the question asking whether there was somebody else in the vehicle with him.

The court did not take the all-or-nothing approach the parties requested. Instead, it found that Miller's subsequent statements were freely and voluntarily made, that Miller understood what he was saying, and that the statements were not the product of any threats or coercion and thus were admissible. But the court made no similar findings with respect to Miller's initial responses, explaining that on the evidence adduced, it could not "make a determination that [Miller] understood what he was saying when he made [the] initial [responses]."

---

[55] See, *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018); *Grant, supra* note 52; *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014); *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013); *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011); *Goodwin, supra* note 54. Accord *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) ("[w]e hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment").

On that basis, the court directed the State to redact the initial responses from the video.

On appeal, Miller challenges the admission of his subsequent statements under *Jackson v. Denno*, but he does not challenge the redaction order under the same analytical framework. Instead, Miller challenges the exclusion of his initial responses under the rule of completeness. We therefore address Miller's *Jackson v. Denno* argument now and will address his argument regarding the rule of completeness in the next section.

[15] Under the circumstances of this case, both Miller and the State treated Miller's subsequent statements as an admission that no one else was in the vehicle with him at the time of the accident. In other words, those statements were viewed by the parties as inculpatory circumstantial evidence that Miller was driving the vehicle when it crashed.[56] This appeal does not require us to consider whether Miller's initial responses can also be considered admissions or confessions, and we express no opinion in that regard. The question for purposes of *Jackson v. Denno* is whether an admission or confession was voluntary, not whether it was true, so questions going to the substance of a statement generally fall outside the scope of a *Jackson v. Denno* hearing.[57]

On this record, and considering the totality of the circumstances, we find no clear error in the district court's conclusions that Miller's subsequent statements were voluntarily made and were not the product of any coercion, promise, or inducement,

---

[56] See, generally, *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993) (referring to statement subject to *Jackson v. Denno* analysis as inculpatory); *Whomble v. State*, 143 Neb. 667, 10 N.W.2d 627 (1943) (defining confession as acknowledgment of guilt and admission as acknowledgment of fact or circumstance tending to prove ultimate fact of guilt).

[57] See, e.g., *State v. Bogguess*, 293 Kan. 743, 751, 268 P.3d 481, 488 (2012) ("[a]t a *Jackson v. Denno* hearing, the issue before the trial court is whether the defendant's statement or confession was voluntary. The truthfulness of the statement is not at issue. . . . Questions that go to the substance of the statements are outside the scope of a *Jackson v. Denno* hearing").

direct or indirect. As stated, coercive police activity is a necessary predicate to a finding that a confession is not voluntary,[58] and we see nothing in Kliegl's questions, tactics, or demeanor at the scene that can be characterized as coercive police activity. Quite to the contrary, when Kliegl arrived at the scene and discovered Miller lying in the ditch, he asked Miller a series of questions to assess the situation, determine whether Miller was injured, and determine whether others may be injured. We find no merit to Miller's argument that the district court erred by finding that his subsequent statements were admissible under *Jackson v. Denno*.

### 3. Rule of Completeness

Next, Miller argues it was error for the court to exclude his offer of the unredacted video containing his initial responses under the rule of completeness. That rule is set out in § 27-106 and provides:

> (1) When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other. When a letter is read, all other letters on the same subject between the same parties may be given. When a detached act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence.

> (2) The judge may in his discretion either require the party thus introducing part of a total communication to introduce at that time such other parts as ought in fairness to be considered contemporaneously with it, or may permit another party to do so at that time.

Miller argues that he was prejudiced by the district court's failure to apply this rule, because the jury was allowed to hear his "statement that he was alone in the vehicle,"[59] but was not

---

[58] E.g., *Hernandez, supra* note 55.

[59] Brief for appellant at 17.

allowed to hear his initial responses, which Kliegl understood to indicate others were in the vehicle. Miller argues that if his initial responses had been allowed into evidence, then "the jury could have come to the same conclusion that Kliegl did initially, that [Miller] was not alone in the vehicle."[60]

[16] The rule of completeness is concerned with the danger of admitting a statement out of context, and when this danger is not present, it is not an abuse of discretion for the trial court to fail to require the production of the remainder of the document or statement.[61] Assuming without deciding that the rule of completeness was violated here, we conclude any error committed by the district court was harmless.

[17,18] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[62] When the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[63]

Here, the jury heard the evidence that Miller contends was admissible under the rule of completeness. At trial, Kliegl testified, without objection, that when he initially asked Miller if he was alone in the vehicle, Miller responded with "like a grunt, like towards a yes." Kliegl then testified that when he asked again later, Miller gave a more definitive "no." And in response to questioning from Miller on cross-examination, Kliegl admitted that the first few times he asked Miller questions at the scene, "all [he got] back [were] unintelligible moans." So although Miller's initial responses were redacted

---

[60] *Id.* at 17-18.

[61] See *State v. Manchester*, 213 Neb. 670, 331 N.W.2d 776 (1983).

[62] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[63] *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017).

from the video exhibit that was played to the jury, Kliegl nevertheless testified about the initial responses, including his understanding that Miller was indicating there were others in the vehicle. The jury thus heard the evidence Miller wanted to admit through the unredacted video. Any error in excluding the unredacted video was harmless beyond a reasonable doubt and does not warrant reversal.

### 4. Sufficiency of Evidence

Miller argues that the evidence adduced at trial, even when taken in the light most favorable to the State, was insufficient to support his convictions for DUI and driving during revocation. He notes that both convictions required proof he was operating a motor vehicle,[64] and he argues that there was insufficient evidence to prove he was operating or in actual physical control of the vehicle found at the accident scene. He contends the evidence was insufficient because no witness saw him driving, he was found 100 feet away from the vehicle, and the vehicle was not registered to him.

[19] But one accused of a crime, including the crime of DUI, may be convicted on the basis of circumstantial evidence if, taken as a whole, the evidence established guilt beyond a reasonable doubt.[65] In *State v. Blackman*,[66] law enforcement found a motorcycle in a ditch along a rural county road. The defendant was found lying near the motorcycle with his feet in the ditch and his back on the roadway. When questioned by law enforcement, the defendant stated he had been traveling westbound and lost control, and he asked for help getting the motorcycle back on the roadway. As to whether this evidence was sufficient to sustain the DUI conviction, we held:

> [The officer] initially observed [the defendant] lying in the ditch next to his motorcycle, and [the defendant] admitted

---

[64] See Neb. Rev. Stat. §§ 60-6,196 and 60-6,197.06 (Reissue 2021).

[65] See, *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016); *State v. Blackman*, 254 Neb. 941, 580 N.W.2d 546 (1998).

[66] *Blackman, supra* note 65.

to [the officer] that he had been operating the motorcycle on the county road immediately before he lost control and landed in the ditch. [The officer] observed symptoms of intoxication almost immediately upon encountering [the defendant]. There is no evidence in the record of other persons . . . in the area where [the defendant] was found by the officer, nor is there any other evidence which would support an inference that [the defendant] had the means or opportunity of ingesting alcohol from the time he lost control of the motorcycle until the officer found him lying beside it in the ditch. [The defendant] argues that the State did not offer evidence to exclude this possibility, but we do not regard the State's burden of proving guilt beyond a reasonable doubt as requiring it to disprove every theoretical hypothesis other than guilt. In this case, it can reasonably be inferred that the deputy found [the defendant] where he had come to rest after losing control of his motorcycle and that [the defendant's] state of intoxication at that time existed when he last operated the motorcycle on the county road. . . . Thus, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the State, we determine that the evidence was sufficient to establish that [the defendant] was operating a motor vehicle while in violation of § 60-6,196 . . . .[67]

Similarly, circumstantial evidence that Miller was the driver of the crashed vehicle included the following: (1) He was the only person found at the accident scene, (2) he was found injured and lying unconscious among debris from the vehicle, (3) he responded "No" when asked if there was anybody else in the vehicle with him, (4) the vehicle was registered to Miller's mother, and (5) investigators searched the accident scene and found no one else who could have been the driver. Viewing

---

[67] *Id.* at 949-50, 580 N.W.2d at 551. See, also, *State v. Miller*, 226 Neb. 576, 412 N.W.2d 849 (1987) (finding circumstantial evidence defendant was driving vehicle under influence when no other persons found in area).

this evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Miller was operating the vehicle. His assignment of error to the contrary is without merit.

### 5. Sentences

Finally, Miller argues that the sentences imposed were excessive and constituted an abuse of discretion. He argues that a "shorter sentence, or a sentence of probation, would allow [him] to support his dependents while paying off his overwhelming medical debt."[68] He also argues the sentencing judge "made comments at sentencing that indicated that the sentence imposed was based, at least in part, on the judge's personal experience."[69] We address each argument in turn, and find neither has merit.

The record demonstrates that both of Miller's sentences were well within the statutory limits, and he does not contend otherwise. A sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion.[70] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[71]

[20,21] The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[72] When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural

---

[68] Brief for appellant at 22.

[69] *Id.*

[70] *Blake, supra* note 12.

[71] *Id.*

[72] *Id.*

background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime.[73] Here, the record shows that the trial court considered the relevant factors when imposing sentence.

Before imposing sentence, the court stated that it had reviewed and considered the presentence investigation report. That report contains information going to each of the sentencing factors.[74] The report describes a lengthy criminal history, including convictions for drug possession and delivery, criminal trespass, assault, forgery, shoplifting, driving under suspension, operating a motor vehicle to avoid arrest, and four prior convictions for DUI. In fact, at the time of sentencing in this case, Miller was serving a 3-year prison sentence imposed on a 2020 DUI conviction.

Our record shows the court considered the relevant sentencing factors, the arguments at sentencing, and Miller's allocution. The court then stated that it had determined imprisonment was necessary for the protection of the public because the risk was substantial during any period of probation that Miller would engage in additional criminal conduct and because a lesser sentence would depreciate the seriousness of his crimes and promote disrespect for the law. It therefore sentenced Miller to imprisonment for not less than 3 years nor more than 3 years on the DUI conviction and to a consecutive term of imprisonment for 3 to 5 years on the conviction for driving during revocation, subsequent offense. On this record, we find no abuse of discretion in the nature or length of the sentences imposed.

---

[73] *Id*.

[74] See Neb. Rev. Stat. § 29-2261 (Cum. Supp. 2020) (presentence investigation report shall include circumstances of crime, offender's history of delinquency and criminality, physical and mental condition, family situation and background, economic status, education, occupation, personal habits, and any other relevant matters).

Miller also argues that when imposing sentence, the judge improperly relied on her personal recollection of his involvement in juvenile court, and he points to the following comments made to him by the court after allocution:

I don't know if you remember me, but I remember you. I used to be a prosecutor before I became a judge, and I started out my career in juvenile court. And your family was in juvenile court for a long time. Judge Thorson really saw something in you and your brother that kept her continuing to give you all chance after chance after chance after chance. I still see that. Even the prosecutor saw that. The defense counsel saw that. Guardian ad litem saw that. Everybody else saw that, I think, except you. You do have what it takes to live a sober life. And just from what you said here today, I think you may be starting down the path, I hope, to say that alcohol is just something that doesn't work for you. . . .

. . . But you did put this community at risk, and you put yourself at risk. . . .

. . . .

. . . I don't think any judge wants to send someone to prison or jail that doesn't need to go there. My hands are tied on a lot of what I can and can't do for people, including you.

Miller does not contend that the judge's comments or recollection of his juvenile court history were grounds for recusal, nor did he make any such request at the time of sentencing. But he argues on appeal that "[t]he judge remembered [him] and his family from [his] juvenile court case many years ago, a case on which the judge was the assigned prosecutor, and [relied] on this personal experience" when imposing sentence.[75]

We note that information regarding Miller's family history and juvenile court history was contained in the presentence investigation report, and therefore, it was part of the information provided to the judge in connection with sentencing.

---

[75] Brief for appellant at 22.

And while the sentencing judge's comments indicate that she remembered Miller from an earlier court case, we see nothing in the record to suggest the judge in any way relied on her personal knowledge, or on any extrajudicial knowledge, when imposing sentence in this case. And we soundly reject Miller's implication that a judge's recollection of prior court proceedings involving the same defendant necessarily shows judicial bias or prejudice.[76]

Miller's juvenile history was not a matter of dispute in this criminal proceeding, and we see nothing suggesting that the judge's recollection of his juvenile history could lead a reasonable person to question the judge's impartiality.[77] To the contrary, we understand the court's comments here to have been made in part to explain the reasons for imposing sentences of incarceration and in part to inspire Miller to make necessary changes in his life and address his substance use by emphasizing what the judge and others perceived as Miller's potential for law-abiding behavior. On this record, we find no abuse of discretion in the court's remarks during sentencing.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

Affirmed.

---

[76] See *Liteky v. United States*, 510 U.S. 540, 551, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994) (rejecting suggestion that prejudice or bias is shown by opinions formed from participation in prior proceedings, stating that "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant"). Accord, *People v. Storms*, 155 Ill. 2d 498, 503, 617 N.E.2d 1188, 1190, 187 Ill. Dec. 467, 469 (1993) ("'[m]erely having a previous involvement with a defendant does not, *per se*, require [judicial] disqualification'"); *Wise v. State*, 257 Ga. App. 211, 570 S.E.2d 656 (2002) (holding trial judge not automatically disqualified from sitting or acting in criminal cases merely because, in prior employment, he or she prosecuted defendant in unrelated criminal proceedings).

[77] Compare *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998).